IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs May 8, 2001

## STATE OF TENNESSEE v. JOSHUA LEE WILLIAMS and MAURICE MIGUEL TEAGUE

**Direct Appeal from the Circuit Court for Henry County**
**No. 12938     Julian P. Guinn, Judge**

_____

**No. W2000-01435-CCA-R3-CD - Filed June 27, 2001**

_____

The defendants, Joshua Lee Williams and Maurice Miguel Teague, encountered each other on the street where Teague produced a pistol and attempted to shoot Williams. When the gun did not fire, Williams knocked it from Teague's hands, picked it up, and fired in turn at Teague, in the process fatally wounding a neighborhood resident. Williams was indicted for first degree murder for the shooting death of the deceased, and criminal attempt to commit first degree murder of Teague, who was indicted for criminal attempt to commit first degree murder of Williams. At the conclusion of their joint trial, Williams was found guilty of second degree murder and criminal attempt to commit second degree murder, and Teague guilty of criminal attempt to commit second degree murder. Williams received an effective sentence of twenty years at 100% as a violent offender. Teague was sentenced as a standard, Range I offender to ten years. Teague raises essentially three issues on appeal: (1) sufficiency of the evidence; (2) not instructing the jury on aggravated assault as a lesser-included offense; and (3) the propriety of his sentence. Williams challenges the sufficiency of the evidence in support of his conviction for second degree murder. After a careful review of the record, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which L. TERRY LAFFERTY, SR.J., joined. DAVID H. WELLES, J., Not Participating.

Guy T. Wilkinson, District Public Defender, and W. Jeffery Fagan, Assistant District Public Defender, for the appellant, Joshua Lee Williams.
Barton F. Robison, Paris, Tennessee, for the appellant, Maurice Miguel Teague.

Paul G. Summers, Attorney General and Reporter; Mark A. Fulks, Assistant Attorney General; G. Robert Radford, District Attorney General; and Steven L. Garrett, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

# FACTS

On the evening of June 14, 1999, between 6 and 7 p.m., eighteen-year-old Joshua Lee Williams and seventeen-year-old Maurice Miguel Teague, each accompanied by a number of "followers," confronted each other in the middle of Irvine Street in Paris, Tennessee. Teague had just received word that Williams planned to "whip him" because he had pulled a gun on Williams's brother in a dispute over money. After an exchange of angry words, Teague pulled a pistol from his waistband and attempted to shoot Williams in the head. When the gun did not fire, Teague tried to hit Williams with the handle of the gun. Williams knocked it from Teague's hands, picked it up, and fired several shots at Teague, who fled down the street. One of these shots struck and killed a neighborhood resident, forty-eight-year-old Carolyn Ray, as she was walking across the street to feed her neighbor's dog. Williams was subsequently charged with first degree murder for the death of Ray, and criminal attempt to commit first degree murder of Teague. Teague was charged with criminal attempt to commit first degree murder of Williams.

At the defendants' joint trial, the State's first witness was Brian Byrd, a criminal investigator with the Tennessee Bureau of Investigation. Byrd testified that he was notified of the shooting at approximately 7:20 p.m. on June 14, 1999. When he arrived at the scene, he first observed the body of Ms. Ray, which appeared to have been shot through the head, lying in the middle of the street.[1] He located and recovered two spent shell casings from a .380 semi-automatic revolver, one thirty feet from the body, and the other fifty to sixty feet from the body. Byrd estimated that the shot that killed Ms. Ray was fired from approximately sixty to seventy feet away. From his subsequent investigation, he determined that two witnesses to the shooting, Joe'l Ray and Elvis Ray, were approximately fifty to sixty feet from where the shot that killed Ms. Ray was fired.

Elvis Rodricka Ray, Jr., testified that he was fifteen years old and that Ms. Ray was his cousin. On June 14, 1999, between 6 and 7 p.m., he was outside Ms. Ray's house at 111 Irvine Street when he saw the defendants, both of whom he knew from the neighborhood, walking towards each other. Elvis[2] testified that Teague was accompanied by "seven or eight other people," and that Williams was followed by "about fifteen other people." The two men met in the middle of the street, where they argued for a minute, until Teague pulled a gun out of his pants, appeared to cock it back, and pointed it at Williams. Elvis next saw Teague attempt to hit Williams by swinging the gun at him. Williams appeared to put his hands up to block the blow, knocking Teague back and the gun to the ground. The witness described what next occurred:

---

[1] Ms. Ray's body was subsequently transported to Memphis for an autopsy by Dr. O.C. Smith. Dr. Smith's autopsy report, which was accepted by all parties and admitted as an evidentiary exhibit in the case, stated that Ms. Ray died as a result of a gunshot wound to the head.

[2] Because the deceased and two of the witnesses have the same last name, we will utilize, for the purposes of clarity, the first names of the witnesses Elvis Rodricka Ray, Jr. and Joe'l Dominique Ray. By this usage, we intend no disrespect.

I mean he [Williams] picked up the gun to try to shoot it, and it wouldn't shoot, and he cocked it back. He started shooting. And Maurice was trying to like get up and run, he like stumbled up and run. And he was like running back towards Carolyn's house, up there by the white house, up there by that big, white house. I heard two gunshots, and then I ran.

Elvis said that he had not been close enough to hear what the men were arguing about. He had not seen either man strike the other before Teague pulled the gun out of his waistband and pointed it at Williams's head. He admitted that he had not been in a position to see whether Teague tried to pull the trigger before attempting to strike Williams with the handle of the gun. Elvis testified that after firing the first shot, Williams jogged down the street after the fleeing Teague, firing as he ran. He said that Williams fired the gun three times.

Joe'l Dominique Ray testified that he was sixteen years old and that Ms. Ray was his aunt. On June 14, 1999, between 6 and 7 p.m., he was sitting on the porch of his house at 111 Irvine Street when he saw Teague get out of a car and walk up the middle of the street. As he walked, "a group of kids joined him from behind." Joe'l said that his aunt, who was on the porch with him, asked if he knew what was going on. He told her that he did not, and she started across the street to feed the neighbor's dog. At that point he saw Williams, who had stepped out from behind the corner convenience store, walking up the street towards Teague. Joe'l testified:

And they met up with each other and they was, you know, talking to each other or whatever, like they was hollering at each other. And then they walked up to each other and Maurice pulled out a gun and tried to hit Lee [Williams] with the gun. And Lee hit Maurice and Maurice fell and dropped the gun. And Lee picked up the gun and pulled the trigger like, I think, twice, from what I seen, and—

Q. Did the gun go off?

A. No, the gun didn't go off.

Q. Then what happened?

A. Then he cocked the gun back, and then he shot like three shots. And that's when I heard my aunt hit the ground. And I went in the house and called the police.

Joe'l stated that as the men met in the middle of the street, each belligerently motioned the other to come forward. Teague responded by taking a step closer to Williams, at the same time pulling the gun out of his pants and "pointing it dead at him." Joe'l then saw Teague looking at the

gun and "messing with it" before raising it in his hand in two overhead strikes at Williams. Joe'l said that Teague did not try to fire the gun at Williams, and that Teague could not have tried to fire the weapon without his having seen it. He had not been close enough to hear what the men were arguing about, but thought that when Teague raised the gun at Williams, he heard Williams say, "If you're going to shoot me, shoot me." Williams, he said, looked shocked and angry.

Joe Lewis Olive, who stated that he was nineteen years old, testified that he was with Joshua Lee Williams at the home of Ann Patton on Irvine Street immediately before the shooting when Williams ran into Teague's brother, Cortino Allen. Williams told Allen, "whenever you see your brother tell him that I'm going to whop his ass when I see him." According to Olive, Williams was angry with Teague because Teague had pulled a gun on Williams's brother during a dispute over money. Olive testified that Allen left to get Teague, and he and Williams walked to a convenience store on the corner of Irvine Street. A few minutes later they saw Teague, accompanied by about twelve people, walking towards them. He and Williams, along with their group of about eight people, walked to meet Teague and his group.

Olive testified that the two groups came to a halt in the middle of the street about seven feet apart. Williams asked why Teague had pulled a gun on Williams's brother. Teague replied, "I'll shoot your ass," pulled a gun from his pants, pointed it at Williams's head, and tried to pull the trigger. When the gun did not fire, Teague hit Williams on the side of the arm with it. The gun fell to the ground. Williams picked it up, took it off safety, chambered a round, took three steps and fired at Teague, who was running back down the street towards Ms. Ray's house.

Olive remembered hearing two shots fired. After the second shot, he saw an object in Ms. Ray's hand fly into the air, and Ms. Ray hit the ground. He estimated that five to seven seconds passed from the time Williams picked up the gun until he began firing at Teague. He said that Williams had not been armed before his confrontation with Teague, and that he had threatened only to beat Teague. Williams had fired the gun without really aiming it, he said. Olive acknowledged that he and Williams were good friends.

## ANALYSIS

## I. Sufficiency of the Evidence

Both defendants challenge the sufficiency of the evidence in support of their convictions. When the sufficiency of the convicting evidence is challenged on appeal, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the offense charged beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979). See also State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992); Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."). All questions

involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

### A. Joshua Lee Williams

Williams contends that the evidence at trial shows that he acted under the heat of passion and thus is guilty of voluntary manslaughter rather than second degree murder. As support, he points to evidence that he was unarmed at the beginning of the confrontation, that he appeared shocked and angry when Teague pulled the gun on him, that only five to seven seconds elapsed from the time he picked up the weapon until he fired the shots, and that he did not take the time to aim the weapon. The State contends that the evidence was sufficient to support Williams's conviction for second degree murder. We agree.

Second degree murder is defined in Tennessee Code Annotated Section 39-13-210(a)(1) as "[a] knowing killing of another."

> "Knowing" refers to a person who acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result.

Tenn. Code Ann. § 39-11-106(a)(20) (1997). Voluntary manslaughter is "the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." Tenn. Code Ann. § 39-13-211(a) (1997).

To support a second degree murder conviction, the State had only to establish that the killing of Carolyn Ray was knowing beyond a reasonable doubt. See State v. Summerall, 926 S.W.2d 272 (Tenn. Crim. App. 1995). The evidence at trial overwhelmingly established this fact. Evidence was presented to show that Williams deliberately walked to meet Teague in the middle of the street, taunting him to come forward to fight. When Teague pulled the gun, Williams knocked him to the ground, and the weapon from his hands. The eyewitnesses testified that while Teague was still on the ground, but in the process of struggling to his feet in an effort to get away, Williams picked the gun up and attempted to shoot him. When the weapon would not fire, Williams took the time to disengage the safety and pull the sliding mechanism back to chamber a round. As Teague fled from him down the street, Williams pursued and fired three shots at his back, striking and killing Carolyn Ray as she was crossing the street. These actions were more than sufficient to show that Williams committed a knowing ( *i.e.*, was aware that his conduct was reasonably certain to result in a death) killing of another.

Williams contends that he was provoked by Teague's attempts to shoot him and thus acted in a state of passion when, within the space of only five to seven seconds, he picked the gun up from the ground, disengaged the safety, chambered a round, and fired, without aiming, at the fleeing Teague. However, the jury was instructed on voluntary manslaughter as well as first and second degree murder. By convicting him of second degree murder, the jurors obviously rejected Williams's contention that he acted in a state of passion produced by adequate provocation. This was their prerogative. See State v. Williams, 38 S.W.3d 532, 539 (Tenn. 2001) (concluding that the trier of fact determines whether a killing resulting from mutual contact is murder second degree or voluntary manslaughter). From the evidence presented at trial, a rational trier of fact could have found the essential elements of second degree murder beyond a reasonable doubt. This issue, therefore, is without merit.

## B. Maurice Miguel Teague

Teague argues that the evidence at trial was insufficient to support his conviction of criminal attempt to commit second degree murder, contending that the evidence failed to show that he intended to kill Williams. He argues that Joe Olive's testimony was not credible, and that evidence that Williams had to remove the gun from safety and pull the sliding mechanism back to chamber a round before the gun would fire, along with the testimony of Elvis and Joe'l Ray that he tried to hit Williams with the butt end of the gun rather than shoot him, shows that he was guilty of aggravated assault instead of attempted second degree murder. The State disagrees, arguing that the evidence was sufficient to support his conviction. Again, we agree with the State.

Criminal attempt is defined, in relevant part:

> (a) A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense:
>
> . . . .

(3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

Tenn. Code Ann. § 39-12-101(a)(3) (1997). Thus, to prove Teague guilty of criminal attempt to commit second degree murder, the State had to show that Teague acted with the intent to cause the knowing killing of another. See Tenn. Code Ann. §§ 39-12-101(a)(3) and 39-13-210(a)(1) (1997).

Viewed in the light most favorable to the State, the evidence was more than sufficient to support the jury's verdict. The proof showed that Teague went to Irvine Street armed with a loaded handgun in expectation of a confrontation with Williams, that he stated his intention to shoot Williams, and that he tried to shoot him in the head. Joe Olive, the eyewitness who was closest to the two men, testified that when they met in the middle of the street, Teague said to Williams, "I'll shoot your ass," as he pulled the handgun from his pants and aimed it at Williams's head. Olive further testified that Teague then tried to pull the trigger, but the gun would not fire.

In his argument, Teague relies heavily on the fact that neither Elvis nor Joe'l Ray saw him try to pull the trigger. He especially emphasizes Joe'l's testimony that he could not have tried to pull the trigger without Joe'l's having seen him do so. Unlike Olive, however, both Joe'l and Elvis were fifty to sixty feet away from the confrontation. Furthermore, although he did not see Teague try to pull the trigger, Joe'l testified that he did see him, while pointing the weapon "dead at [Williams]," "messing with [the gun]." Elvis testified that he saw Teague attempt to "cock the gun," and acknowledged that from his position in front of Ms. Ray's house, he could not see whether Teague tried to pull the trigger. The jury could have reasonably inferred that if Elvis did not have a clear view from his position in front of the house, Joe'l, who was on the porch, would not have had one either. It was within the jury's province to accredit the testimony of Joe Olive that Teague attempted to pull the trigger as he pointed the gun at Williams's head. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987) (stating that credibility of witnesses and weight to be accorded their testimony is within the province of the jury, as the trier of fact). This issue, therefore, is without merit.

## II. Failure to Instruct on Aggravated Assault

Teague next contends that the trial court erred in failing to instruct the jury on aggravated assault as a lesser-included offense of criminal attempt to commit first degree murder. He argues that the facts in this case supported an instruction on aggravated assault as a lesser-included offense, and that the jury "might well have convicted" him of that offense if they had received an instruction on it. The State responds by arguing that Teague has waived the issue by his failure to support the issue by argument or citation to authorities; that this court has previously held that aggravated assault is not a lesser-included offense of attempted first degree murder; and that even if error, failure to instruct on aggravated assault was harmless since the jury found Teague guilty of attempted second

degree murder to the exclusion of voluntary manslaughter, the immediately lesser-included offense with which it was charged.

As the State points out, this court considered the same issue in State v. Christopher Todd Brown, No. M1999-00691-CCA-R3-CD, 2000 WL 262936, at *2 (Tenn. Crim. App. Mar. 9, 2000). There, as in the case at bar, the defendant argued that in his prosecution for attempted first degree murder, the trial court should have instructed the jury on aggravated assault and assault as lesser-included offenses. Id. at *1. In our analysis, we noted that the statutory elements of assault and aggravated assault are not included within the statutory elements of attempted first degree murder, and that neither offense meets part (b) or (c) of the Burns test.[3] Id. at *2. We thus concluded that assault and aggravated assault are not lesser-included offenses of attempted first degree murder. Id. The trial court in this case, therefore, did not err in refusing to instruct the jury on aggravated assault as a lesser-included offense of attempted first degree murder. This issue is without merit.

### III. Sentencing of Teague

---

[3] This test for analyzing lesser-included offenses states:

An offense is a lesser-included offense if:

(a) all of its statutory elements are included within the statutory elements of the offense charged; or

(b) it fails to meet the definition in part (a) only in the respect that it contains a statutory element or elements establishing

　　(1) a different mental state indicating a lesser kind of culpability; and/or

　　(2) a less serious harm or risk of harm to the same person, property or public interest; or

(c) it consists of

　　(1) facilitation of the offense charged or of an offense that otherwise meets the definition of lesser-included offense in part (a) or (b); or

　　(2) an attempt to commit the offense charged or an offense that otherwise meets the definition of lesser-included offense in part (a) or (b); or

　　(3) solicitation to commit the offense charged or an offense that otherwise meets the definition of lesser-included offense in part (a) or (b).

State v. Burns, 6 S.W.3d 453, 466-67 (Tenn. 1999).

Finally, Teague contends that the trial court erred in sentencing him to ten years imprisonment. He argues that the trial court improperly applied enhancement factors, and failed to apply mitigating factors, in enhancing his sentence from the minimum sentence of eight years to ten years. He asserts that given his lack of judgment due to his youth, and the facts and circumstances of the case, he should have received an eight-year sentence and been placed on probation. The State argues that the trial court correctly enhanced Teague's sentence to ten years based on the presence of applicable enhancement factors and the lack of any relevant mitigating factors.

When an accused challenges the length and manner of service of a sentence, it is the duty of this court to conduct a *de novo* review on the record with a presumption that "the determinations made by the court from which the appeal is taken are correct." Tenn. Code Ann. § 40-35-401(d). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). The presumption does not apply to the legal conclusions reached by the trial court in sentencing the accused or to the determinations made by the trial court which are predicated upon uncontroverted facts. State v. Butler, 900 S.W.2d 305, 311 (Tenn. Crim. App. 1994); State v. Smith, 891 S.W.2d 922, 929 (Tenn. Crim. App. 1994). However, this court is required to give great weight to the trial court's determination of controverted facts as the trial court's determination of these facts is predicated upon the witnesses' demeanor and appearance when testifying.

The defendant, as the party challenging the sentence imposed by the trial court, has the burden of establishing that his sentence was erroneous. Sentencing Commission Cmts. to Tenn. Code Ann. § 40-35-401; Ashby, 823 S.W.2d at 169; Butler, 900 S.W.2d at 311. In determining whether the defendant has shown that the sentence imposed by the trial court was erroneous, this court considers (a) any evidence received at the trial and/or sentencing hearing, (b) the presentence report, (c) the principles of sentencing, (d) the arguments of counsel, (e) the nature and characteristics of the offense, (f) any mitigating or enhancing factors, (g) any statements made by the accused in his own behalf, and (h) the accused's potential or lack of potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-103 and -210; State v. Scott, 735 S.W.2d 825, 829 (Tenn. Crim. App. 1987).

As a Range I, standard offender convicted of criminal attempt to commit second degree murder, a Class B felony, Teague was subject to a sentence ranging from eight to twelve years. See Tenn. Code Ann. § 40-35-112(a)(2) (1997). Procedurally, the court must start at the minimum sentence in the range, enhance the sentence as appropriate for any applicable enhancement factors, and then reduce the sentence as appropriate for any applicable mitigating factors. See Tenn. Code Ann. § 40-35-210(c) and (e) (1997). The weight to be given any applicable enhancement or mitigating factors is within the trial court's discretion, so long as it complies with the purposes and principles of the 1989 Sentencing Act, and its findings are supported by the record. See Tenn. Code Ann. § 40-35-210 (1997), Sentencing Commission Comments; State v. Moss, 727 S.W.2d 229, 237 (Tenn. 1986); Ashby, 823 S.W.2d at 169.

In enhancing Teague's sentence to ten years, the trial court applied four enhancement factors: the defendant was the leader in the commission of an offense involving two or more criminal actors; the defendant used or employed a firearm, explosive device or other deadly weapon during the commission of the offense; the defendant had no hesitation about committing a crime when the risk to human life was high; and the defendant was adjudicated to have committed a delinquent act or acts as a juvenile that would constitute a felony if committed as an adult. See Tenn. Code Ann. § 40-35-114(2), (9), (10), and (20) (1997). The court rejected Teague's proposed mitigating factor that he lacked substantial judgment because of his youth. See Tenn. Code Ann. § 40-35-113(6) (1997). Finding no other mitigating factors to be applicable, and confinement to be necessary both to avoid depreciating the seriousness of the crime and to provide an effective deterrence to others likely to commit similar offenses, see Tenn. Code Ann. § 40-35-103(1)(B) (1997), the court sentenced Teague to ten years in the Department of Correction, and denied his request for alternative sentencing.

The trial court based the application of enhancement factor (2), that the defendant was a leader in an offense involving two or more criminal actors, on Teague's role in bringing the loaded weapon to the confrontation, finding that without Teague's "leadership in coming up with the weapon," the crimes would not have occurred. To apply enhancement factor (2), the defendant need be only *a* leader, not the sole leader, in an offense. See State v. Elizabeth Maria Ortiz, No. 01C01-9607-CC-00284, 1998 WL 155585, at *6 (Tenn. Crim. App. Mar. 31, 1998). The record supports the trial court's application of this enhancement factor.

The record also supports the application of enhancement factor (9), that the defendant used or employed a firearm, explosive or dangerous weapon in the commission of the offense. See, e.g., State v. Jackson, 946 S.W.2d 329, 334 (Tenn. Crim. App. 1996) (concluding that enhancement factor (9) was appropriate in case of attempted first degree murder when evidence showed defendant used knife). Enhancement factor (10) was also appropriately applied, due to the evidence of the large number of bystanders in the area, including the group surrounding Williams. See State v. Sims, 909 S.W.2d 46, 50 (Tenn. Crim. App. 1995) (concluding that enhancement factor (10) is appropriate when persons other than the victim are nearby and subject to injury from the defendant's actions).

Teague's presentence report reveals two prior convictions as a juvenile – a domestic assault conviction at the age of seventeen, and an aggravated assault conviction at the age of twelve. Juvenile offenses occurring after July 1, 1995, can be considered only if they qualify under Tennessee Code Annotated Section 40-35-114(20), which requires that, for consideration, a juvenile offense must be such that, if committed by an adult, it would be a felony. See State v. Jeffery Ray Jennings, No. E1999-00848-CCA-R3-CD, 2000 WL 274078, at *4 (Tenn. Crim. App. Mar. 14, 2000); State v. Glynnon Bradshaw, No. 01C01-9810-CR-00439, 1999 WL 737871, at *2 (Tenn. Crim. App. Sept. 22, 1999). Of Teague's two juvenile convictions, only that for aggravated assault would be a felony if committed by an adult. However, that conviction is sufficient to justify the application of enhancement factor (20).

Finally, the record also supports the trial court's refusal to apply mitigating factor (6), that the defendant lacked substantial judgment due to his youth. Teague was seventeen years old at the

time of this offense and, according to him, had completed the eleventh grade and was the father of a child. According to a psychiatric evaluation, Teague was in the low average range of intelligence.

In sum, the trial court correctly found four enhancement factors applicable, and no relevant mitigating factors. The presence of these enhancement factors, combined with the absence of mitigating factors, justifies the enhanced ten-year sentence imposed. Since he was sentenced to ten years for a Class B felony, Teague was neither eligible for probation, see Tenn. Code Ann. § 40-35-303(a) (1997), nor presumed to be a favorable candidate for alternative sentencing. See Tenn. Code Ann. § 40-35-102(6) (1997). The record supports the trial court's findings that confinement was necessary to avoid depreciating the seriousness of the offense and to act as a deterrence to others likely to commit similar offenses. We, therefore, affirm the sentence as imposed by the trial court.

## **CONCLUSION**

After a thorough review of the record, we conclude that the evidence was more than sufficient for a reasonable trier of fact to find both defendants guilty of the crimes for which they were convicted beyond a reasonable doubt. We further conclude that the trial court did not err in failing to instruct the jury on aggravated assault as a lesser-included offense of criminal attempt to commit first degree murder, and that the ten-year sentence imposed on Teague was appropriate. Accordingly, we affirm the judgments of the trial court.

---

ALAN E. GLENN, JUDGE